UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| RAYMOND COURNOYER,<br><br>Plaintiff,<br><br>vs.<br><br>WESTON FISCHER, ELI KUHLMAN, UNDETERMINED NUMBER OF JOHN DOES,<br><br>Defendants. | 4:18-CV-04114-RAL<br><br>OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff Raymond Cournoyer sued two law enforcement officers, Defendants Weston Fischer and Eli Kuhlman, under 42 U.S.C. § 1983, claiming that they used excessive force by pushing him into his car, shoving him to the ground, and tasing him. Both Defendants moved for summary judgment based on qualified immunity. This Court grants the motions because the officers acted reasonably when they pushed Cournoyer into his car and shoved him to the ground and did not violate a clearly established constitutional right when they tased Cournoyer.

I.  Facts

The alleged excessive force in this case occurred shortly after midnight on September 17, 2017. At 12:22 a.m., Weston Fischer, a trooper with the South Dakota Highway Patrol, saw a car driving westbound on South Dakota Highway 46 at what appeared to be a high rate of speed. Doc. 27 at ¶ 1; Doc. 33 at ¶ 1; Doc. 29-1[1] at 12:22:25–40; see also Doc. 23 at ¶ 7. Trooper Fischer's

---

[1]Document 29-1 is the dash camera video from Trooper Fischer's patrol car.

1

front radar indicated that the car was speeding, going 72 miles per hour in a 65 miles per hour zone. Doc. 27 at ¶ 2; Doc. 33 at ¶ 2. He turned his patrol car around to follow the car, which by then had entered the town of Wagner, South Dakota, and had slowed to approximately 50 miles per hour in a 30 miles per hour zone. Doc. 27 at ¶ 3; Doc. 33 at ¶ 3; Doc. 29-1 at 12:22:40–50. Trooper Fischer activated his emergency lights, signaling the car to stop, but it continued speeding through Wagner. Doc. 27 at ¶¶ 4–5; Doc. 33 at ¶¶ 4–5; Doc. 29-1 at 12:22:40–55. He then activated his siren. Doc. 27 at ¶ 7; Doc. 33 at ¶ 7; Doc. 29-1 at 12:22:54. The vehicle still did not stop. Doc. 27 at ¶ 7; Doc. 33 at ¶ 7; Doc. 29-1 at 12:22:54–12:24:27.

Meanwhile, Eli Kuhlman, an officer with the Wagner Police Department, overheard on his police radio that a car was driving through Wagner going 20 to 30 miles per hour over the speed limit. Doc. 17 at ¶ 1; Doc. 22 at ¶ 1. Shortly thereafter, he saw the car traveling at a high rate of speed, and Trooper Fischer following behind with his emergency lights and siren activated. Doc. 17 at ¶ 2; Doc. 22 at ¶ 2; Doc. 29-1 at 12:22:40–12:24:27. Officer Kuhlman activated his emergency lights and siren and followed behind Trooper Fischer.[2] Doc. 17 at ¶ 3; Doc. 22 at ¶ 3.

The car turned off Highway 46 using a turn signal and pulled in to the parking lot of the Wagner Good Samaritan Society nursing home. Doc. 27 at ¶ 8; Doc. 33 at ¶ 8; Doc. 29-1 at 12:24:00–27. All told, the car had continued driving for one minute and forty-four seconds after Trooper Fischer activated his emergency lights and had traveled almost the entire length of Wagner. Doc. 27 at ¶ 11; Doc. 33 at ¶ 11; Doc. 29-1 at 12:22:41–12:24:25. Although the speed limit in Wagner is 30 miles per hour, Trooper Fischer's dash camera recorded speeds ranging from

---

[2]Cournoyer disputes that Officer Kuhlman activated his lights and siren because Cournoyer "did not see emergency lights or hear sirens from Officer Kuhlman." Doc. 22 at ¶ 4. Cournoyer does not offer any other evidence that Officer Kuhlman did not activate his lights and sirens, and two sirens can be heard on the dash camera video. Doc. 29-1 at 12:24:08–27.

48 to 64 miles per hour as he followed the car through town. Doc. 17 at ¶ 1; Doc. 22 at ¶ 1; Doc. 27 at ¶ 6; Doc. 33 at ¶ 6; Doc. 29-1 at 12:22:50–12:24:05.

Trooper Fischer and Officer Kuhlman parked behind the car in the nursing home lot. Doc. 17 at ¶ 5; Doc. 22 at ¶ 5; Doc. 27 at ¶ 8; Doc. 33 at ¶ 8; Doc. 29-1 at 12:24:15–30. The dash camera video from Trooper Fischer's vehicle shows a man, whom Trooper Fischer later learned to be Cournoyer, exit the car. Doc. 27 at ¶¶ 12, 32–33; Doc. 33 at ¶¶ 12, 32–33; Doc. 29-1 at 12:24:23–30. As Cournoyer did so, Trooper Fischer shouted "Get out of the car! Come here! Come here!" Doc. 27 at ¶ 13; Doc. 33 at ¶ 13; Doc. 29-1 at 12:24:27–31. The video shows Cournoyer look directly at Trooper Fischer, shut his car door, and walk away toward the nursing home, disappearing from the dash camera's view. Doc. 29-1 at 12:24:27–34; Doc. 27 at ¶ 14; Doc. 33 at ¶ 14. Officer Kuhlman can then be seen running from his car towards Cournoyer and Trooper Fischer. Doc. 29-1 at 12:24:33–36; Doc. 27 at ¶ 16; Doc. 33 at ¶ 16.

The parties offer differing accounts of what happened next. Trooper Fischer can be heard on his body microphone saying, "Come here! Get over here!" as Cournoyer walks away. Doc. 29-1 at 12:24:33–36; Doc. 27 at ¶ 15; Doc. 33 at ¶ 15. Cournoyer asserts that he is hard of hearing in his left ear and that he saw Trooper Fischer but did not hear him say anything. Doc. 23 at ¶ 12; Doc. 33 at ¶¶ 13, 15. He claims that he shouted to Trooper Fischer "that [he] was in a hurry to see [his] mother before she passed away" as he "turned to rush into the nursing home." Doc. 23 at ¶ 13. However, neither the video nor the audio from the incident support Cournoyer's assertion. The video shows Cournoyer exit his car, look directly at Trooper Fischer and, without saying anything, turn and begin walking toward the nursing home. Doc. 29-1 at 12:24:27–35. Cournoyer cannot be heard saying anything on the audio until approximately four seconds later when he says, "My mother is dying, motherfucker!" after which one of the officers says, "Put your hands behind

3

your back! Put your hands behind your back!" Doc. 29-1 at 12:24:30–43. The evidence not subject to genuine dispute—the video and audio—dispels Cournoyer's assertion that he told Trooper Fischer about his mother before Trooper Fischer told him to "Come here!" and before he began walking toward the nursing home. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Cournoyer recalls "rushing" towards the nursing home when he was grabbed by his arm from behind and pushed chest first into his car. Doc. 33 at ¶ 11; Doc. 23 at ¶¶ 13–14; see also Doc. 24 at 3 ("As [Cournoyer] proceeded to the nursing home, he was grabbed from behind, apparently by Trooper Fischer and Defendant Eli Kuhlman."). Cournoyer felt the officers shove him to the ground where he struck his face, leaving him stunned. Doc. 23 at ¶ 15. Cournoyer had tried to break his fall, so he landed with his arms and hands underneath him. Doc. 23 at ¶ 16. Cournoyer recalls that Officer Kuhlman then tased him while he was lying on the ground with his arms and hands underneath him,[3] and that the tasing caused him extreme pain.[4] Doc. 23 at ¶¶ 16–17; see also Doc. 22 at ¶ 9; Doc. 24 at 3. From Cournoyer's perspective, Trooper Fischer and Officer Kuhlman then proceeded to kneel on top of him and handcuff him. Doc. 23 at ¶ 20; see also Doc. 24 at 3. Cournoyer found it difficult to breathe with the officers kneeling on him and

---

[3]Paragraphs 15–17 of Cournoyer's affidavit, Doc. 23, indicate that he was lying on top of his hands and arms when he was tased. His brief reads the same way. Doc. 24 at 3 (describing how Officer Kuhlman tased him and then stating "Officer Kuhlman and Trooper Fischer knelt on top of Raymond, pulled his arms from underneath him, and handcuffed him."). Also, Cournoyer's response to Officer Kuhlman's statement of undisputed material facts made clear that he was on the ground with his arms beneath him when tased. Doc. 22 at ¶ 9.

[4]Between 15 to 20 minutes after his arrest, Cournoyer can be overheard on Trooper Fischer's body microphone saying "You guys need more powerful tasers. Them fuckers didn't do nothing to me." Doc. 29-1 at 12:45:25–30.

4

was unable to stand up on his own because he was out of breath and stunned from hitting his head. Doc. 23 at ¶¶ 20–21.

Trooper Fischer and Officer Kuhlman describe the arrest differently than Cournoyer. They recall grabbing Cournoyer's arms as he walked towards the nursing home, but Cournoyer attempted to pull away. Doc. 27 at ¶ 18; Doc. 17 at ¶¶ 7–8. Officer Kuhlman says that he then backed up approximately three feet and deployed his taser, striking Cournoyer near the right side of his back. Doc. 17 at ¶ 9. According to Officer Kuhlman, the taser had minimal impact on Cournoyer because of his heavy coat[5] and the proximity, and Cournoyer continued to physically resist. Doc. 17 at ¶ 9. As the officers tell it, Officer Kuhlman pulled Cournoyer to the ground and Trooper Fischer fell on top of Cournoyer because he had been grabbing Cournoyer's arm. Doc. 17 at ¶ 10; Doc. 27 at ¶¶ 20–21. Officer Kuhlman recalls that Cournoyer continued to resist on the ground, Doc. 17 at ¶ 11, and both officers agree that they worked together to pull Cournoyer's arms behind his back to handcuff him, Doc. 17 at ¶ 12; Doc. 27 at ¶ 22.

On the audio recording, at the point that appears to be shortly after Cournoyer was handcuffed, Trooper Fischer can be heard asking Cournoyer "What's going on?" and Cournoyer replies "My mother's dying." Doc. 29-1 at 12:25:39–46; Doc. 27 at ¶ 23; Doc. 33 at ¶ 23. When Trooper Fischer asked Cournoyer why he didn't stop, Cournoyer responded "Let me up, I can't breathe. Let me up!" Doc. 29-1 at 12:25:47–53; Doc. 27 at ¶ 23; Doc. 33 at ¶ 23. At that point Cournoyer's daughter, who is an EMT, approached and told the officers that Cournoyer was a diabetic. Doc. 29-1 at 12:25:53–12:26:02; Doc. 27 at ¶ 24; Doc. 33 at ¶ 24. Trooper Fischer stated "Eli, help him up." Doc. 29-1 at 12:26:00–04; Doc. 27 at ¶ 24; Doc. 33 at ¶ 24.

The following exchange then occurred between Trooper Fischer and Cournoyer:

---

[5]Cournoyer maintains that he was wearing a t-shirt and a sweatshirt rather than a "heavy coat." Doc. 23 at ¶ 18.

5

> Trooper Fischer: What's going on?
> Cournoyer: I said my mother's dying.
> Trooper Fischer: Your mother's dying, okay. I was trying to stop you back there.
> Cournoyer: I know you were!
> Trooper Fischer: And you were doing 60 through town, okay?
> Cournoyer: I know.
> Trooper Fischer: So you understand why we are doing this, right?
> Cournoyer: Yes.

Doc. 29-1 at 12:26:15–27; Doc. 27 at ¶ 25; Doc. 33 at ¶ 25.

Trooper Fischer requested an ambulance to evaluate Cournoyer. Doc. 17 at ¶ 14; Doc. 22 at ¶ 14. While waiting for it to arrive, Trooper Fischer told Cournoyer that he had stopped a member of Cournoyer's family earlier that evening. Doc. 29-1 at 12:34:50–12:35:05; Doc. 17 at ¶ 12; Doc. 22 at ¶ 12; Doc. 27 at ¶ 34; Doc. 33 at ¶ 34. Trooper Fischer said that he had allowed the person to go as soon as he learned that they were going to see a dying relative. Doc. 17 at ¶ 12; Doc. 22 at ¶ 12; Doc. 27 at ¶ 34; Doc. 33 at ¶ 34. At the time of the arrest, however, Trooper Fischer did not know Cournoyer's identity. Doc. 27 at ¶¶ 32–33; Doc. 33 at ¶¶ 32–33. Similarly, Officer Kuhlman did not learn that Cournoyer's mother was dying until after the arrest. Doc. 17 at ¶ 13; Doc. 22 at ¶ 13. Trooper Fischer told Cournoyer multiple times after the arrest that had Cournoyer pulled over originally or obeyed Trooper Fischer's commands he would have let Cournoyer leave and see his dying mother. Doc. 27 at ¶ 31; Doc. 33 at ¶ 31.

The Wagner Ambulance Service arrived on the scene and evaluated Cournoyer for injuries. Doc. 17 at ¶ 17; Doc. 22 at ¶ 17. Cournoyer received a contusion to his head and ankle from the incident, as well as a taser wound. Doc. 27 at ¶ 27; Doc. 33 at ¶ 27. Cournoyer's daughter removed the taser probes from Cournoyer after unsuccessful attempts by Officer Kuhlman and ambulance personnel.[6] Doc. 23 at ¶¶ 25–27. Cournoyer refused further medical attention because he wanted

---
[6]Department policy directs that medical personnel should remove the taser probes. Doc. 17 at ¶ 17; Doc. 22 at ¶ 17.

to see his mother. Doc. 17 at ¶ 17; Doc. 22 at ¶ 17; Doc. 27 at ¶ 28; Doc. 33 at ¶ 28; Doc. 23 at ¶ 28. The officers bonded Cournoyer out at the scene, so he could be with his family. Doc. 17 at ¶ 18; Doc. 22 at ¶ 18. Sadly, however, Cournoyer's mother had died by then. Doc. 23 at ¶ 23.

Cournoyer was charged with eluding a police officer, but this charge was later amended via a plea agreement under which Cournoyer pleaded guilty to failure to stop at the signal of a law enforcement officer. Doc. 27 at ¶¶ 29–30; Doc. 33 at ¶¶ 29–30; Doc. 17 at ¶¶ 18–19; Doc. 22 at ¶¶ 18–19.

Cournoyer sued Trooper Fischer and Officer Kuhlman under § 1983, alleging that they used excessive force when they pushed him into his car, shoved him to the ground, and tased him. Doc. 1. He also asserted a state-law battery claim against both officers. Doc. 1. The officers moved for summary judgment, arguing that qualified immunity protects them from Cournoyer's excessive force claim and that this Court should decline to exercise supplemental jurisdiction over the battery claims. Docs. 16, 26.

## II.   Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d

1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); see also Reasonover v. St. Louis Cty., 447 F.3d 569, 578 (8th Cir. 2006) ("Evidence, not contentions, avoids summary judgment.") (quoting Mayer v. Nextel W. Corp., 318 F.3d 803, 809 (8th Cir. 2003)). Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

### III. Analysis

#### A. Qualified Immunity and Fourth Amendment Standard

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Qualified immunity is a defense available to police officers sued in their individual capacities under § 1983. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. "Government officials are entitled to qualified immunity unless both of these questions are answered affirmatively." Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (cleaned up) (citation omitted).

Here, Cournoyer claims that the officers violated the Fourth Amendment by using excessive force against him. The Fourth Amendment prohibits the use of "unreasonable" or "excessive" force when seizing a person. Graham v. Connor, 490 U.S. 386, 395 (1989). At the same time, police officers "undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011) (internal citation omitted). The plaintiff in an excessive force case must show that the "particular use of force" was objectively unreasonable given "the facts and circumstances confronting" the officers at the time. Graham, 490 U.S. at 396–97.

Courts gauge the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (cleaned up) (internal citation omitted). Applying the reasonableness standard in this way recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 397. Facts relevant to the reasonableness of an officer's use of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. This Court addresses the officers' decision to push Cournoyer into his car and shove him to the ground before turning to the tasing.

**B. Pushing Cournoyer into his car and shoving him to the ground**

Trooper Fischer and Officer Kuhlman did not use excessive force when they pushed Cournoyer into his car and then shoved him to the ground. Cournoyer had just sped through Wagner, refusing to stop despite the flashing lights and sirens. The dashcam video shows that, once stopped in the nursing home parking lot, Trooper Fischer twice ordered Cournoyer to "Come here!" as Cournoyer exited his car. Doc. 29-1 at 12:24:28–33. Rather than heeding these commands, Cournoyer looked directly at Trooper Fischer before he turned and hurried towards the nursing home. Doc. 29-1 at 12:24:28–33; Doc. 27 at ¶ 14; Doc. 33 at ¶¶ 11, 14; Doc. 23 at ¶ 13. It appears from the video that Trooper Fischer told Cournoyer to "Come here!" two more times before anyone grabbed Cournoyer. Doc. 29-1 at 12:24:30–34; Doc. 27 at ¶ 15; Doc. 33 at ¶ 15.

Even taking as true Cournoyer's claim that he didn't hear Trooper Fischer's commands, the officers had no way of knowing this. See Neal v. Ficcadenti, 895 F.3d 576, 581 (8th Cir. 2018) ("Law enforcement officers are not required to read a suspect's motivations in failing to obey commands—it is enough that the officer reasonably perceives that the suspect is not following orders as given."). And despite Cournoyer's argument over whether he was actively resisting or attempting to evade arrest, it is undisputed that Cournoyer, having just failed to stop his car for emergency lights and sirens, hurried toward the nursing home instead of complying with Trooper Fischer's multiple commands. Doc. 29-1 at 12:24:28–36; Doc. 27 at ¶¶ 14–15; Doc. 33 at ¶¶ 11, 14–15; Doc. 23 at ¶ 13. Trooper Fischer and Officer Kuhlman reasonably could have understood Cournoyer's actions as either resisting or attempting to flee and were therefore entitled to use a reasonable amount of force to arrest him. See Ehlers v. City of Rapid City, 846 F.3d 1002, 1011 (8th Cir. 2017) (holding that officer could use force to effect an arrest where the suspect, who ignored officer's two commands to place his hands behind his back and walked away from officer,

"at least appeared to be resisting"); McCoy v. City of Monticello, 342 F.3d 842, 848 (8th Cir. 2003) (stating that a reasonable officer could believe that a suspect was "actively fleeing to resist arrest" when the suspect continued driving for at least a mile after the police officer activated his lights and siren) see also Cockrell v. City of Cincinnati, 468 F. App'x 491, 496 (6th Cir. 2012) ("[F]light, non-violent though it may be, is still a form of resistance."). Indeed, Cournoyer's failure to stop for the lights and sirens and refusal to heed Trooper Fischer's multiple commands would have suggested to reasonable officers that Cournoyer was going to continue on his way unless the officers physically stopped him.

In hindsight, of course, pushing Cournoyer into his car and shoving him to the ground may not have been necessary, especially given that he only wanted to see his mother before she died. But the officers couldn't be certain about Cournoyer's reasons for refusing to stop, Doc. 27 at ¶¶ 32–33; Doc. 33 at ¶¶ 32–33; Doc. 17 at ¶ 13; Doc. 22 at ¶ 13, and their conduct must be judged "from the perspective of a reasonable officer on the scene," Graham, 490 U.S. at 396. From this perspective, pushing Cournoyer into his car and shoving him to the ground—after Cournoyer had just failed to stop his car and then hurried toward the nursing home rather than heeding Trooper Fischer's commands—was not objectively unreasonable. Ehlers, 846 F.3d at 1011 (holding that officer did not use excessive force when he executed a takedown on a suspect after the officer twice ordered the suspect to place his hands behind his back but the suspect continued walking away).

Cournoyer offers three other reasons for finding that pushing him into his car and shoving him to the ground was excessive, but they are not persuasive. Cournoyer argues first that the officers acted unreasonably because he did not pose a threat to anyone and his crimes—speeding and eluding—were nonserious misdemeanors. Cournoyer's conduct, however, created an

uncertain, rapidly evolving situation; he had just sped through town, ignoring the sirens and emergency lights, and was heading toward the nursing home. Trooper Fischer yelled "come here" multiple times but Cournoyer refused. The officers could not know for certain why Cournoyer had refused to stop or what he planned to do at the nursing home. Moreover, even if the officers did not view Cournoyer as a serious threat, the Fourth Amendment did not require them to let Cournoyer choose when and where he would stop. See McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011) (explaining that although the warrants authorizing a suspect's arrest were based on misdemeanors, the officers "were not required to let [the suspect] run free"); Buckley v. Haddock, 292 F. App'x 791, 794 (11th Cir. 2008) (explaining that the government has a "significant interest in enforcing the law on its own terms, rather than on terms set by the arrestee").

Cournoyer argues relatedly that Trooper Fischer should have known that he wasn't fleeing or resisting given Trooper Fischer's earlier stop of someone going to see a dying relative at the nursing home, Cournoyer's "obvious rush to get to the nursing home," and his statement "to Trooper Fischer "as he hurried from his vehicle into the nursing home." Doc. 32 at 9. There are at least two problems with this argument. First, the circumstances Cournoyer cites, even when construed in his favor, would not have conclusively established in an officer's mind that Cournoyer was simply going to visit a dying relative and did not pose a threat to anyone. Instead, Trooper Fischer faced a rapidly evolving situation in which he could not be certain about Cournoyer's intent or mental state. Second, and more importantly, even if Trooper Fischer somehow could infer that Cournoyer was hurrying to see his mother, Cournoyer's refusal to stop for the police cars and Trooper Fischer's commands still provided a reasonable basis for believing that Cournoyer was resisting or eluding arrest. Although Cournoyer's desire to see his mother may explain his

behavior, it does not excuse his choice to ignore the officers or make the officers' response unreasonable.

Cournoyer also cites a string of Eighth Circuit cases and asserts that using a "'violent and uncontrolled' takedown of 'a nonviolent, nonthreatening misdemeanant who was not actively resisting arrest or attempting to flee'" violates the Fourth Amendment. Doc. 32 at 9 (quoting Karels v. Storz, 906 F.3d 740, 747 (8th Cir. 2018)). As explained above, however, a reasonable officer could have interpreted Cournoyer's conduct—hurrying toward the nursing home rather than heeding Trooper Fischer's multiple commands—as resisting or attempting to flee. As such, cases involving nonviolent, nonthreatening misdemeanants who did not resist arrest or attempt to flee do not help Cournoyer. See Ehlers, 846 F.3d at 1011 ("[Plaintiff's] argument that no force was appropriate because he was being arrested for a nonviolent misdemeanor and was not resisting is inapplicable because he at least appeared to be resisting.").

### C. Use of Taser

Cournoyer also argues that Officer Kuhlman used excessive force when he shot Cournoyer with the taser and that Trooper Fischer is liable under § 1983 for failing to "object to or prevent" the tasing. Doc. 32 at 7. Again, it is undisputed that Cournoyer, having just failed to stop his car for emergency lights and sirens, "rushed" toward the nursing home instead of complying with Trooper Fischer's multiple commands. Doc. 29-1 at 12:24:28–36; Doc. 23 at ¶¶ 13–14; Doc. 27 at ¶¶ 14–15; Doc. 33 at ¶¶ 11, 14–15. Taking the nonmovant Cournoyer's version of the facts as true, he was headed toward the nursing home when he was grabbed by his arm from behind and pushed chest first into his car. Doc. 23 at ¶¶ 13–14. The officers shoved him to the ground where he struck his face, leaving him stunned. Doc. 23 at ¶ 15. Cournoyer had tried to brake his fall, so he landed with his arms and hands underneath him. Doc. 23 at ¶ 16. Officer Kuhlman then shot

Cournoyer with the taser as Cournoyer laid on the ground with his arms and hands underneath him. Doc. 23 at ¶¶ 16–17; see also Doc. 22 at ¶ 9; Doc. 24 at 3.[7]

It is a close question whether Officer Kuhlman engaged in excessive force by tasing Cournoyer. This Court need not decide that question, however, because Officer Kuhlman's conduct did not violate a clearly established right under the Fourth Amendment.

Qualified immunity protects the officers from Cournoyer's § 1983 claim so long as they didn't violate his "clearly established" constitutional rights. Reichel v. Howards, 566 U.S. 658, 664 (2012). A right is "clearly established" if the law was sufficiently clear that every reasonable officer would understand that his conduct violated that right. District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). Although a plaintiff need not cite a "case directly on point," to show that a right is clearly established, "controlling authority" or "a robust consensus of cases of persuasive authority" must put the "constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741–42 (2011) (citation and internal marks omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S. Ct. at 589 (cleaned up) (citation omitted).

Courts deciding whether a constitutional right is clearly established must avoid defining the right at "a high level of generality." Kisela v. Huges, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation and internal marks omitted). Instead, the "dispositive question is whether the violative nature of *particular* conduct is clearly established." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (citation and internal marks omitted). Defining the right with "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to

---

[7]At some point while the officers were arresting Cournoyer, a man pulled up in his truck and ran toward them. Doc. 29-1 at 12:24:45–12:25:12. The officers shouted at the man to stay back. Doc. 29-1 at 12:24:45–12:25:12. The arrest occurred off camera, so this Court does not know whether the man ran towards the officers before or after the tasing.

determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. (cleaned up) (citation omitted). As the Supreme Court recently explained, "[u]se of excessive force is an area of the law in which the results depend very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Kisela, 138 S. Ct. at 1153 (citation and internal quotation marks omitted).

Citing Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009), Cournoyer claims that it was clearly established that using "a taser on a nonresistant, non-threatening person would violate the Fourth Amendment." Doc. 24 at 8. The Eighth Circuit in Brown denied qualified immunity to an officer who tased a misdemeanant after she refused to end a 911 call while merely sitting in the passenger seat of a car. 574 F.3d at 498. The Eighth Circuit held that "the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator." Id. at 499; see also id. ("[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."); De Boise v. Taser Int'l, Inc., 760 F.3d 892, 897 (8th Cir. 2014) ("[N]on-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers . . . .").

But there are important differences between the circumstances in Brown and the circumstances the officers faced here. The situation in Brown was not tense, uncertain, and rapidly evolving. 574 F.3d at 497. Brown was sitting quietly in the passenger seat and had not done anything to indicate she was resisting arrest or attempting to flee. Id. The officer told Brown to

get off the phone twice, to which Brown responded that she was afraid and wanted to remain on the line with the 911 operator. Id. at 494. Without saying anything else, the officer tased Brown. Id. In contrast, Cournoyer had sped through town, refusing to stop for the emergency lights and sirens. He then ignored multiple commands to stop and started walking quickly toward the nursing home, which a reasonable officer could have interpreted as resisting arrest or attempting to flee. Although Cournoyer was on the ground when Officer Kuhlman tased him, the events immediately preceding the tasing make this case materially different from Brown. In other words, Brown is not similar enough to this case to put a reasonable officer on notice that tasing Cournoyer would violate the Fourth Amendment.

Cournoyer has not cited any other "controlling authority" or a "robust consensus of cases of persuasive authority" putting the constitutional question here "beyond debate." al-Kidd, 563 U.S. at 741–42 (citation and internal marks omitted); see also Smith v. City of Minneapolis, 754 F.3d 541, 546 (8th Cir. 2014) (explaining that officers bear the burden of proof for the affirmative defense of qualified immunity, but the plaintiff "must demonstrate that the law was clearly established" (citation omitted)). And the Eighth Circuit's decision in Ehlers, 846 F.3d 1002, suggests that tasing Cournoyer might have been reasonable. In that case, Officer Dirkes instructed Ehlers twice to put his hands behind his back. Id. at 1007. Ehlers refused and continued to walk away, so Dirkes used a spin takedown to throw Ehlers to the ground. Id. Ehlers landed on his back with his hands in the air and Dirkes turned him over onto his hands and knees. Id. Dirkes then pushed Ehlers's head down and ordered him to put his hands behind his back. Id. Another officer came and kneeled on Ehlers's shoulder, placing him facedown on the ground. Id. A third officer crossed Ehlers's legs and then pressed him into the ground by lifting his legs toward his back. Id. A fourth officer then approached, took Ehlers's left arm from underneath his body, and

placed it in an arm bar. Id. at 1007–08. "Meanwhile," Dirkes warned Ehlers that he was going to use a taser and then tased Ehlers in the back using the drive-stun mode. Id. at 1008. Ehlers was then handcuffed and placed under arrest. Id.

The Eighth Circuit held that the tasing did not violate the Fourth Amendment because Dirkes "reasonably could have interpreted Ehlers's behavior of continuing to lay on his hands and refusing to comply with instructions as resistance . . . regardless of whether Ehlers actually intended to resist." Id. at 1011. Like in Ehlers, Cournoyer was lying with his arms and hands underneath him when he was tased.[8] See Doc. 23 at ¶¶ 16–17; Doc. 22 at ¶ 9; see also Doc. 24 at 3. Moreover, there were at least three officers involved in the Ehlers arrest and those officers had a fair degree of physical control over Ehlers when he was tased. 846 F.3d at 1007. Here there were only two officers involved in the arrest and Cournoyer does not allege that they had him in an arm bar or were pressing down on his crossed legs when Officer Kuhlman tased him. See Doc. 23 at ¶¶ 14–17. Although there are differences between Ehlers and this case,[9] Ehlers is similar enough to undercut Cournoyer's argument that the officers' conduct violated a clearly established right.

Cournoyer also argues that "[a] genuine issue of fact exists regarding whether Officer Kuhlman used his taser on [Cournoyer] after [Cournoyer] had already been restrained and brought to the ground." Doc. 24 at 8. Summary judgment might be inappropriate if there were actually a question of fact about whether Cournoyer was handcuffed when he was tased. See Henderson v.

---

[8] Also like Ehlers, one of the officers twice told Cournoyer to put his hands behind his back as they were arresting him. Doc. 29-1 at 12:24:33–43. The video did not capture the arrest, however, so this Court cannot tell for certain whether the officers told Cournoyer to put his hands behind his back before or after the tasing.

[9] One difference is that Dirkes used his taser in drive stun mode while Officer Kuhlman shot Cournoyer with the taser darts. Some courts have concluded that using a taser in dart mode is a more serious Fourth Amendment intrusion than deploying it in drive-stun mode. McKenney, 635 F.3d at 364 (Murphy, J., concurring).

Munn, 439 F.3d 497, 502–03 (8th Cir. 2006). In Henderson, the Eighth Circuit denied qualified immunity to an officer who pepper sprayed a suspect who was lying face down on the ground with both arms handcuffed behind him and in pain from a baton strike that broke his ankle. Id. at 502–03. The Eighth Circuit explained that even if the suspect had resisted arrest initially (which the suspect denied), a reasonable jury could find that he stopped doing so once he was "handcuffed and pinned facedown on the ground." Id. at 503. Here, however, it is undisputed that Cournoyer was not handcuffed when he was tased but rather was lying with his arms and hands underneath him after he had just ignored Trooper Fischer's multiple commands to "Come here." See Doc. 23 at ¶¶ 16–17; Doc. 22 at ¶ 9; Doc. 24 at 3. This case is therefore more like Ehlers than Henderson, and Henderson would not have put a reasonable officer on notice that tasing Cournoyer constituted excessive force. Cournoyer has not cited any authority suggesting that Officer Kuhlman was required to conclude that Cournoyer was completely subdued and finally ready to follow the officers' orders when Officer Kuhlman tased him.

It is very unfortunate that Cournoyer was not able to see his mother one last time before she died. And Officer Kuhlman may have been too quick to use his taser. However, none of the cases Cournoyer cites clearly establishes that tasing a suspect while he was lying on the ground, with his arms and hands underneath him, after he had just sped through town refusing to pull over for the police and had walked quickly toward the nursing home despite being told multiple times to stop, amounts to excessive force. The officers are entitled to qualified immunity on Cournoyer's § 1983 claims.[10]

---

[10] Qualified immunity protects Trooper Fischer from Cournoyer's claim that he should have prevented Officer Kuhlman from tasing Cournoyer. Because it was not clearly established that Officer Kuhlman used excessive force, Trooper Fischer was not on notice that his failure to prevent the tasing violated Cournoyer's Fourth Amendment rights. See Hollingsworth v. City of St. Ann, 800 F.3d 985, 991 (8th Cir. 2015).

### D. Battery Claim

Cournoyer also asserts a state-law battery claim against Trooper Fischer and Officer Kuhlman. Doc. 1 at ¶¶ 38–40. Having granted summary judgment on Cournoyer's federal claims, this Court declines to exercise supplemental jurisdiction over his state-law claims. See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

### IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that Defendants' motions for summary judgment, Docs. 16, 26, are granted.

DATED this 29th day of July, 2019.

BY THE COURT:

*Roberto A. Lange* (signature)
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE